GARY L. WILLIS, Plaintiff and Appellant, v. ST. PETER'S HOSPITAL, Defendant and Respondent.

No. 11906.
Submitted May 12, 1971.
Decided June 21, 1971.
Rehearing Denied July 20, 1971.
486 P.2d 593.

Loble, Picotte & Loble, Helena, Gene A. Picotte and Robert F. Adams, Jr., argued, Helena, for appellant.

Gough, Booth, Shanahan & Johnson, Helena, Ward A. Shanahan and Myron E. Pitch, argued, Helena, for respondent.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

This is an appeal by plaintiff from an order of the district court of Lewis and Clark County granting defendant's motion for a directed verdict at the close of plaintiff's case-in-chief. Only one issue is presented for review. Did the trial court err in granting defendant's motion, basing its holding on a recent case of this Court, Luebeck v. Safeway Stores, Inc., 152 Mont 88, 446 P.2d 921?

Plaintiff is Gary L. Willis, who on January 23, 1969, was a patrolman on the Helena City Police Force. Defendant is St. Peter's Hospital, a corporation of Helena, Montana.

Between the hours of 8 a.m. and 9 a.m. on January 23, 1969, plaintiff was on duty in a patrol car and was dispatched by radio to St. John's Hospital to transfer a patient to St. Peter's Hospital. Upon arrival at St. John's Hospital, he found an elderly woman who was having difficulty breathing awaiting his assistance to get her to St. Peter's Hospital. He put her in the patrol car and took her to the emergency entrance to St. Peter's Hospital driving up onto the curb to be as close to the emergency entrance as possible, to facilitate getting the patient into the hospital. Upon stopping his car he opened the door on the driver's side, intending to assist his passenger out of the opposite side of the car. In the process of getting out his left leg went to one side, his body to the other, causing a back injury that later forced him to retire from the police department.

For several weeks previous to January 23, 1969, the city of Helena had been inundated by snow and the streets and parking areas were icy and rutted. The early morning of January 23 found the thermometer at -35°.

St. Peter's Hospital is located in the southeastern area of the city of Helena. Several parking lots and entrances to the hospital are provided, but the emergency entrance, covered by a canopy, is located on the west side of the hospital and

faces a hillside cut. Due to the swirling snow created by wind conditions resulting from the hillside cut to the west and the openness on the other two sides, the maintenance people at the hospital had difficulty keeping the parking lot and the emergency entrance clear of snow and ice. James Blankenship, chief engineer for the hospital, testified that his orders were to keep the sidewalks and driveways clear of snow and ice and that both prior to and after January 23 they plowed and used a deicer material to melt the snow and ice; that during the stormy time there was "at least twenty five or thirty feet under the canopy that was completely clear all winter and was not subject to snow getting in there or snow drifting in there."

He further testified that a chemical substance used to melt ice was used daily when needed and that often when it was very cold the chemical only partially melted the ice and snow, but he denied that the result of this use of the chemical before January 23 left ice on top of ice that had not been totally melted. The records of the hospital revealed the 4:00 p.m. shift on the 22nd had:

"Started plowing snow but Jeep boiled over before I went thirty feet from—thirty feet so quit. Later on plowed snow, real slow. Cleaned the emergency—emergency and sidewalks."

There was also considerable testimony by Mr. Blankenship concerning efforts made to clear the snow on the days previous to January 23, with particular note to a big storm on the night of January 20.

Contra testimony concerning the condition of the west side parking lot and the emergency entrance on and prior to January 23, was given by a number of witnesses for plaintiff. Robert Batch, a police officer and an off-duty ambulance driver, testified that on January 21 it was necessary to back the ambulance up onto the curbing at the emergency entrance in order to unload a patient due to the area being "slick and snow packed." He further testified that later, on January

27, he went to the hospital with his own snow removal rig to assist in plowing the snow and clearing the ice. He described the conditions he found at the emergency entrance as follows:

"Well it was an old snowpack. You could see it was the color of brown or grey from standing for some time, having had foot traffic and car traffic on it. * * * I wouldn't say it was obviously dangerous. It was old snow packed. * * * Well I entered—well, the emergency entrance which was emphasized to me, to clear the hill and the sidewalk area around the emergency, and if you're familiar with the emergency entrance at St. Peter's, you come down on a slight incline and through a loop and the hill and loop was snow packed and that was emphasized.

"They would like to get the ruts out and the pack out and I attempted to do this as well as the main entrance to the hospital."

Officer Batch testified he was unable to cut the ice out of the emergency entrance area even with the use of a hydraulic ram.

One Tony Jurkiewicz, an ambulance driver, testified that all through the month of January he had delivered patients to the emergency entrance of St. Peter's Hospital and the slippery ice and snow conditions continued throughout the month.

Officer Vonada, who drove plaintiff to the hospital after his accident, described the emergency entrance area as being covered with snow and ice.

From the testimony given, up to the granting of the directed verdict at the close of the plaintiff's case, there was evidence for the jury's consideration on whether or not there was a hidden dangerous condition at the emergency entrance and whether the hospital took reasonable precautions under the existing conditions to protect those using the entrance.

We find the trial judge misread *Luebeck* in applying that holding to a case, such as the instant case, where the medically

ill and the infirm must use the facilities, such as a hospital. We note with interest that the trial judge in ruling as he did, stated that it was against his better judgment. In applying *Luebeck*, he said:

"They have ruled that there is no liability where there's an accumulation of ice and snow in a parking lot. Albeit, it is in front of a grocery store. But I see no difference between a parking lot in front of a grocery store and in front of a hospital. Maybe there is. But the case [Luebeck] is wide enough to include everything.

"The court has granted a directed verdict for the Defendant in this case because of that case, which is a very recent case, too, \* \* \* against my better judgment."

In *Luebeck* the plaintiff went to the store voluntarily to get groceries, right after a snow storm and before the store had a chance to do anything about the accumulated snow. In the instant case the plaintiff, in the performance of his police duties, took a patient to a hospital.

In *Luebeck* nothing had been done after the storm to the parking lot. Here, the testimony of a number of witnesses refers to plowing, shoveling and the use of chemicals. In *Luebeck*, Mr. Justice Castles referred to the fact the condition of the parking lot was open, visible and obvious, and that the plaintiff knew the conditions were "bad". Here, there is a question of knowledge by Officer Willis and particularly so at the emergency entrance.

The *Luebeck* decision was grounded on facts vastly different than those of the instant case. A person can patronize a grocery store at times other than when the physical conditions may be dangerous, the same cannot be said of a hospital. In *Luebeck*, we noted the "natural accumulation of ice and snow." Here, the evidence presented raises a jury question as to whether the slippery snow and ice pack at the emergency entrance was the result of a natural accumulation or the careless use of the deicer chemical used. In *Luebeck*, we relied on

the fact the dangerous condition was "obvious." Here, there is a question raised as to whether negligent acts created a dangerous condition.

In Pushard v. J. C. Penney Co., 151 Mont. 82, 85, 438 P.2d 928, 929, we said the question of liability is a jury question when "Whether the premises were in a reasonably safe condition is a question of fact * * *."

In considering the propriety of granting the directed verdict at the close of the plaintiff's case, we are of the opinion that had the trial judge fully considered a recent opinion of this Court on directed verdicts he would have allowed the case to go to the jury. In McIntosh v. Linder-Kind Lumber Co., 144 Mont. 1, 8, 393 P.2d 782, 785, we held:

"1. Upon a motion for a directed verdict in favor of the defendant, the evidence introduced by the plaintiff will be considered in the light most favorable to him as proving whatever it tends to prove.

"2. A cause should never be withdrawn from the jury, unless the conclusion from the facts follows necessarily, as a matter of law, that a recovery cannot be had on any view which can be drawn reasonably from the facts which the evidence tends to establish.

"3. In reviewing an order directing a verdict for the defendant, this court will consider only the evidence introduced by the plaintiff, and if that evidence, when viewed in the most favorable light, tends to establish the case made by the plaintiff's pleadings, the order will be reversed." See also Johnson v. Chicago, M. & St. P. Ry. Co., 71 Mont. 390, 230 P. 52.

This cause is reversed and a new trial ordered.

MR. JUSTICES DALY and HASWELL, concur.

MR. CHIEF JUSTICE JAMES T. HARRISON, (dissenting) :

I dissent.

I do not believe the district court was in error in granting

the motion for a directed verdict at the conclusion of plaintiff's case.

Much is said in the majority opinion about the weather conditions in Helena on January 23, 1969, and there is no dispute in that respect. But of all the people who would be familiar with the weather conditions on that morning certainly a police officer in a patrol car, whose duties require that he be available at all times to carry out matters concerned with the public health and safety, would be one. With his knowledge of the weather conditions, he was at the time of the unfortunate occurrence transporting an elderly woman from one hospital to another in extremely cold weather.

The majority distinguishes our holding in *Luebeck* and while I concede there is a difference in the fact situation here and in *Luebeck*, yet as the author states in regard to *Luebeck*: "* * * we relied on the fact the dangerous condition was 'obvious'."

How the conditions, existing in and around Helena on January 23, 1969, could have been more "obvious" than they were in this instance is beyond me, and particularly when the "observant" is a police officer, driving his patrol car in the course of his employment, engaged in an errand requiring great care for the safety of his elderly passenger.

I would affirm the judgment.

MR. JUSTICE CASTLES, (concurring):

I concur in the dissent of Chief Justice JAMES T. HARRISON.